Your Honor, I am here to discuss the disclosure made by Whistleblower which was thrown out because the AHA deemed it too vague in general and the board deemed it frivolous. Mr. Bates, are staffing and budget issues of this nature legitimately protected disclosures under the Whistleblower Protection Act? Yes, sir. That would be apparent because it involves public health. In this case, the complaint was in two folds. It was the staffing of the dietary clinic. Right, and lack of administrative resources, meaning secretarial, that sort of thing. In fact, the record shows that one assistant chief of staff had earlier complained about having to spend an hour on the telephone instead of assisting patients. This is the kind of thing that, in fact, on page 22 of the appendix, there is a commendation, outstanding contributions of Dr. Bouchard. And in that, which was coterminous with an increased promotion sort of thing issued by the DA and with the stamp of his, at that time, superior. A greater significance is his most recent success in satisfying the council's psychiatry medical education requirements to reinstate full accreditation. The dietary residency program has lost its accreditation. Nobody seems to be arguing that Dr. Bouchard was not a competent physician. They seem to be saying, the MSRB seems to be saying, this is not protected under the Whistleblower Act. The next sentence, I think, addresses what you're saying, your question. The loss of the dietary residency would have eliminated the majority of our podiatric service delivery capability and would have had a drastic impact on the health of our federal patients. And that was before the OSC. The government says, tell your supervisor that you need more staff because the current staff is inadequate to achieve what you've just said. And I say that that's true. They tell your supervisor you need more staff when the supervisor doesn't provide the additional staff. That's right. How does that become a protected disclosure? He was penalized by making those complaints. And others were not penalized. His successor as director of podiatry at the hospital and the residency program lost accreditation a year later. Admitted and discovery was there was no felony against him. He did not lose his job. He was not terminated. So he had 17 years of service and lost his retirement. As I understood it, the board below found the three disclosures by your client problematic, not because they hadn't raised the subject of a possible health issue, but that they had lacked specificity. That's right. And that's what I would like to get to. What's happening to you is to say, well, sure, if you throw enough resources at a problem, more likely than not, you might have better luck in having a beneficial effect with the problem. But that under our chamber's line of precedence, especially in this field where we're talking about health and public safety, more specificity than simply we need more resources is required. And how do you respond? Do you agree with me that that's essentially the ground on which you were failing for the number one? Right. Definitely. In terms of the AJ decision, now all the board did was to say, well, on that ground, we find it's frivolous. He didn't evaluate the decision. He just used that terrible word. Yes. That's the word for non-frivolous. Right. Right. And which is against the traditional legal. It's an unfortunate term. It is. Because in the real world, it has a pejorative connotation. If I say to you that you're being frivolous, that's not a very polite way to say something. Right. But what it means in the context of the law, as we've said it, is that your allegation has enough germs in a way to germinate. It has enough subject matter to it that a reasonable person hearing it would understand that you were making a complaint about. But I find that that is associated with whistleblower cases and perhaps some adverse action cases in the federal system more than it is in the law. And the traditional concept of frivolousness is bad faith. That's OK. I took your point that I think I probably teased it out between the lines because I think you were being polite in your brief. I think it struck me that one of your main concerns is that you've been denied a hearing. That's right. Because our case law, not me, not Judge Wald, not Judge Hill, and the body of case law says that at the front door jurisdictional entry point, you don't get a hearing. And I think your basic argument was that you think that law is incorrect. We had deposition notices out. We would have liked to ask the doctors there if they thought this was specific. They did think it was specific. But just to be fair to the precedent, if the law were such that a very and admittedly thin disclosure, I think that we could improve. I think we could have better service around here than we do. That would be very good for the veterans. That would be very general. If that passed the test, but then you automatically got a hearing at which you might be able to develop more information so as to be able to make a full-blown allegation, it would seem that that might turn the ex-man law on its head. I don't think so. We're dealing with experts. We have an expert here. He was the director at Dynature. He was the director of the residency program. His opinion was not just a bald assumption. He had worked in this department. And it's interesting that the AHA says that that does not make the disclosure specific on page 10 of his decision. I'm sorry. I'm on page 10 of my brief. I'm on his decision. It is 10 appendix. Rather, the corollary question that must be raised by the disclosure to make it specific is whether the current staffing level was minimally sufficient to provide adequate medical care. That's a foreign concept in medicine that, OK, as long as you're minimally staffed to provide adequate care, the VA wouldn't adopt that principle. Their expectation is to provide quality care, not minimal staffing, minimal administrative resources to provide adequate care. I think that's bogus analysis by the AHA. And the board just said, all right, screw this. We find it too vague. I'd like to ask a question about the sort of shape of the board's decision that we have in front of us. As we all know, you had a proceeding in front of the administrative judge. The administrative judge ruled against your client on three grounds, that there was not a protective disclosure, and that if there had been one, it was the wrong person, and that you had an obligation to do it anyhow. OK? The case goes up to the full board. And as I understand it, you briefed all three issues to the full board because you didn't know what was going to happen. And I saw pieces of your brief in our records. The full board, however, decides to only address the issue of whether the disclosures were protected, concluding that they were too vague in general, and therefore it doesn't matter to whom they were directed. Then at the end of the, and by the way, the Merit System Protection Board has gotten in a habit recently of taking cases up like this and sort of dipping their finger into a piece of it, but not the rest, and then writing something. And then here, at the end, they deny the petition for review, meaning that they didn't take the case up to themselves. And they say, except it's modified by this final order. The initial decision is final. Here comes the final decision. Do you read the board's opinion to have modified the two grounds that were ruled upon by the AJ but were not touched by the board? Did the full board decision modify those two other grounds? The board uses the term modified very loosely, as you know. In just about, I'd say, well, almost half of their opinions, they say, as modified, we affirm. I know. My point is I'm getting at that, too. Because you chose to brief and bring on appeal only in the question of whether the disclosures were. That's right. I wanted to hit that. I had to hit that. Because that, I think, is central to the AJ's determination. The only two that I argued were right. The thing that we're on now is that if you chose to appeal only the disclosure issues, and you said you didn't raise the other because the board hadn't addressed them. Right. My question is, does that mean that by not addressing them, they went away? That is my assumption. Because in any case, we have to cross the bridge and agree with you that these were protected disclosures. Don't you see what I'm talking about? If we disagree with you and say, oh, we're sorry, sir, these were not protected disclosures, that will indicate your client will not prevail. Right. But if you were to prevail with us that we believe that the disclosures were protected, then the question is, are those other two grounds alive? The government contends and looks at six of its briefs on page 25 that they are alive. Why wouldn't they be alive? Because the board did not consider them. Even though it was brief, and they said it was modified. When they said except is modified. Right. And they leave the rest of it alive. I think that they were bound to address it under the context of the way it was raised. Well, our only case law on this, interestingly enough, is a celebrated Dodd case from a few years back. And in Dodd, the facts were different because what happened was that the full board took the case up on its own, which it has the authority to do under its regulations. And we said when that happens, the final decision of the board supersedes the initial decision. And by superseding it, it simply wipes it out. And there's support in the regulations of the proposition that when the full board either grants a petition for review, in case they supersede, or if they take it up on their own motion, they do. We'll have to figure that out. I think they superseded it and said this is the ground that we're moving to say in general. And that's the ground that I hit. Now, may I say this? There was an administrative investigation board, going back to two specific, two non-specific and two general. The ground that the AJA ruled on and that the board agreed with. A board was installed to investigate Dr. Bouchard because of administrative miscues. That's exactly what he was complaining about, lack of administrative support. A certificate was issued wrongly. The Council on Medical Education converted a five-tier system for residents down to two tiers. There was a lot of obfuscation about what the program was. What certificates had to be issued? He issued a certificate that the council said was incorrect, and they had it reissued, which it did. By that time, he had made his complaints, and his superiors had recommended a board. They investigated, and you know what the board found? They found that there was administrative lack of support. That's exactly what he complained about. And then they recommended steps to counter that, and they recommended more physician staff. Instead of four-A's physician, and they cut him down to three-A's full-time. And they recommended that my client be retained. We will save the minutes for rebuttal. Thank you for your time. Thank you. Ma'am, please, the court. Mr. Morrow. I'd like to first address your questions about the language used by the board. The initial decision is final, except it's modified. That does leave the initial decision, in effect, as part of the board's final decision in the case. It's a little confusing, because sometimes it's not clear whether they have or haven't actually modified anything. Let's accept that. Accept that. It's in Dr. Bichotte's favor, so that is a reasonable reason. I don't think it's in his favor. No, we're, yeah. Because the judge is finding that there were additional bases for finding that disclosure not protected were not discussed, so they remain, in effect, as alternative bases. I said keeping the issues alive, rather than saying that there's beyond the issue. No, if we were to rule that we disagree with you on the protected disclosure issue, and we said no, it was a protected disclosure, what do we do with the fact that the two undergrounds were appealed? I think you would, well, you'd have to address them, I think. So they are alive, and we would have to address them. If we agree with those two grounds, then he would lose. That's correct. So, what I'm saying to you, maybe my colleagues wouldn't agree. No, I mean, if you didn't agree with those grounds, then you would get a remand, even if you disagreed entirely. What I'm trying to say to you, and I want to say it, is that I think the board's current practice of picking up all these cases and making a few comments, not modifying in the way we know modify to mean, and then saying, except to modify the board, I think that's a trap for the unwary, especially for a pro se party, because they're not sure whether the grounds, other grounds that were in the agency are alive or not. I take your point. I would hope that you would go back to the board and say they should be clear. And in this particular case, let me just have them go forward, because the decision of the board said here, further, because they're too vague to represent, or say it does not matter to whom they directed them. So that suggests that they actually looked at those grounds. It does not matter. And is there a possible modification by the fact that they looked at them? That's why I'm saying all of them were modified. He interpreted it that way. I would encourage us to start with a principal issue of whether these are protected disclosures, and then we can turn to the others. I've said mine. I heard your point. The board correctly found that the petitioner's disclosures were too vague in general to be a protected disclosure under the statute, which is defined as a disclosure of information that a person could reasonably believe. It wasn't that they were vague in general, particularly, although those terms are there. It's whether complaining to your supervisor, at least this is what I see of concern, complaining to your supervisor that you need to increase the staff because inadequate service is being provided, you need a secretary because you're diverted to secondary activities, whether those disclosures are what's contemplated by the Whistleblower Act. We see what the board said about it. Well, the board found both that because they were normal duties, and to make recommendations about staffing is a normal part of the petitioner's duty, and it was done through normal channels to the appropriate person, the courts found that that is not a protected disclosure. Then you have an extreme disciplinary action following these complaints by a concerned physician. This is why we're here. It was just a matter of disagreeing with your supervisor, being told, never mind, we don't have money for more staff, or whatever. Yes. And you go about your business. That's one thing. They didn't go about their business. They removed, through liberation it appears, Dr. Bouchard from his position and from his entire activity. But the Whistleblower Protection Act only protects statements that are qualified as protected disclosure as a basis for challenging an action of this kind, which was based on an agency investigation of Dr. Bouchard about something else unrelated to this issue. But if he had disclosed a substantial and specific danger to public health and safety, that would have given him a basis to challenge the decision that's retaliated, but not if it was not a protected disclosure. He says that we're so inadequately staffed we're providing inferior service. Isn't that a danger to public health and safety? Well, he didn't really go that far. He said that it prevented them from fully addressing quality care issues. And if you look at the language of the statute, it requires a substantial and specific danger to public health and safety. And the substantial and specific language, the history of it shows that Congress did not want to protect merely general assertions, but rather assertions that disclosed specific circumstances that would create a serious harm. He did? He said we performed only so many amputations and that's inadequate service? Well, that actually was something that he disclosed that had occurred years before where the amputations went down in number. But things he could have said. He could have said, well, he could have presented a correlation between the staff-patient ratio and favorable and unfavorable outcomes over a period of time. He supported his claim that we're having a problem here. But the amputation issue was not in either of the three disclosures? No, it wasn't in the three disclosures. They were very brief. Well, let's assume that the supervisor at this hospital knows the situation. And here we have someone who's concerned and makes a fuss about it. You say if he had specific data, it would have been protected, and since he didn't have specific data, it's not protected? Exactly. That's what the law provides. And the reason why it provides it is to encourage whistleblowers to reveal specific problems, serious problems, that need to be remedied. Cry out for remedy. His language in these emails doesn't rise to that level because it's just like any other kind of generalized discussion of staffing issues. So how do you explain the dramatic reaction? Well, the board didn't even reach the issue as to whether what happened to Dr. Bouchard had anything at all to do with these emails. In fact, there was an agency investigation about something he did in his capacity as director of the residency program, and that appears to be the reason why he was removed from his position as chief of the podiatry section. If he has the burden to show that no, that's not really what happened, it's because I made a protection disclosure, but he has failed to do that. The Chambers case really illustrates what the distinction is between general types of statements that don't qualify and specific ones that do. In that case, Chambers disclosed what the budget was for the year for the Park Service Police, and it was inadequate. Well, those are very fact-dependent cases. Let's talk about this case. Okay. Well, I'm just trying to hear. He's merely making general statements about, well, we're concerned about our ability to provide quality care. But he didn't allege that any particular harm had occurred to any patient or that there was a foreseeable risk of that based on some details. But the MSPB should have said, you need to complete the record. There's more information there. Well, the problem with that, Your Honor, is that the premise of these cases is that the disclosure has been made and there's been retaliation for the disclosure. And the only – any person who made the disclosure knows that they've made the disclosure. They have it in their power to allege what they said. They don't need discovery to discover what they said and what – which they're claiming was the basis for retaliation. In other words, you can't just make a vague statement and then start the case so you can discover a basis on which they might have just retaliated against you. They couldn't have retaliated against him based on a statement he never made that he's seeking to discover now. But that isn't this case either. It seems, I mean, as you look at the facts of this case, that there were these complaints to the supervisor and there was a response that was just about immediate of a removal, part-time, and then… With respect, Your Honor, there were three disclosures that he relied on in his appeal. One was in 2002, one was in 2004, and one was in 2005. I believe that the response to the first one was, oh, yeah, I think that's a good idea, but I'm – that we should hire more staff, but I don't know that we – I have to warn you that we may not have the funding for that. We go ahead and try to find some people that we could hire. That's in the very first one on page 69 of the – of his appendix. The response was, I understand we'll begin the recruitment – no, I'm in support of your beginning the recruitment process. However, you must recognize that our budget is already overspent. Then the response to the one two years later was, he was complaining about having to do administrative things or something that was distracting him from other things, and the response was, it may be appropriate for you to change your allocation of duties so you're not a subject. That's the second one on 70. That's right. And then the third one is a letter in which he – a year later in which he merely – he was requested to come to – he's been sent home for some reason related to this investigation, which is in the petitioner's – some of the materials about the agency investigation is in the petition. He wanted to notify the superiors that he would be available. Because he wanted to come in and – But all he disposed was a vague thing about, well, because I – he spoke of confusion and inconsistencies in the program, which he attributed to his being removed as director. So he's viewed as a complainer. He's put on half-time work, essentially taken out of the environment of his work. What recourse does such a person have if, in fact, this is retaliation? Well, if it were retaliation or a protected disclosure, he would have recourse to the force. But he didn't make a – but these disclosures are not protected under the case law because they're too vague, and they were more like just normal dialogue with – or recommendations to your superior. He has the burden to allege – to make a non-frivolous allegation that he disclosed information that a reasonable person would say was evidence of a substantial and specific harm. He hasn't identified any incidents with patients that were – because of the shortage of staff, they were unable to be seen or they weren't given the proper attention. He hasn't put in evidence showing any correlation between staff levels and bad outcomes in the program. Presumably, Congress especially wanted to encourage the – And they may – and that's why they put in this limitation in the statute. Presumably, also, they recognized that statements about allocation of resources in connection with agency commissions are very, very frequent, and they probably wouldn't have wanted any statement of this kind, just any statement, to be a basis for a whistleblower appeal. It would be very disruptive and would simply overwhelm the system, presumably, if they didn't put some limits on it. When was this other investigation commenced? Let me be more specific. Does it predate 10 November 2005? Oh, I think so, yeah. I'm sorry. You might ask the petitioner. Let me see if I can find that in here. The report issued on 2006, the conclusion that he should be removed as chief, but kept as a managerial requirement. But when it commenced, I'm not sure. I don't know that. I'm sorry. But again, even if it were a retaliatory – I mean, even if it – you have to have it linked to a protected disclosure report to be actionable under the statute to breach the MSPB. Our jurisdiction is limited to actions taken because of a protected disclosure as defined in the statute. The reason I'm asking you that question is because I don't think anything at Appendix 69 or 70 rises to any level. 71 looks to me like it's written as a setup, that it's in effect saying, hey, something's going on and I don't like it, and I'm going to allege some things. But if something's already going on, then the action that has been instituted is not reprisal. Yeah, the timing would be all wrong. So I want to know when that – But I'm not sure – Well, it doesn't – if you look at 71, this is Dr. Bruchard writing to the supervisor. He sent me a memo of number two. Right. We discussed him being – he would inform me that I had been placed on informal duty. He had been sent home at that point. Is that a result of an investigation? You imply that. I want to know what it is when it's meant. Well, I can only tell you what – I don't know when the investigation was commenced. It was, as I said, you know, the conclusion of it was issued in January 2006, but I don't know how far back it goes. Well, he was informed on the 9th, okay, that he had been placed on this duty status. So that's a tactic against him, being placed on that status, and that occurred a day before his November 10th – And he does – he's got a memo on November 2nd saying he will be investigated. So something – Oh, it definitely had happened earlier. Or he makes his November 10th in Skolotron. Something's going on. Right, yes, definitely. Okay, we'll ask Mr. Bates. We're running out of time as well. Anything that seems critical you'd like to ask Mr. Burroughs? Okay, thank you, Mr. Burroughs. Okay, Mr. Bates, do you know the answer to this question? The chronology, if I can think out loud on this, is that he – is that a CPME visit was scheduled on November the 18th, and he was given a draft showing that he would be interviewed by CPME while he was still on duty. He'd been reduced in hours, but he was still on duty. Through the influence of his superior and the podiatric director of the central office, it was apparently decided that he should not be available for the site visit by CPME, which was necessary for the accreditation of the podiatric residency program. Therefore, he was scheduled for duty at home and prohibited from visiting the medical clinic at any time. But if you can answer the question, I suppose, on what date did that investigation begin? You sort of danced towards it when you said he had been reduced in hours. What was that in response to? Well, the first thing had been the reduction. Then the letter that indicated he would stay at home. So what was that in response? And then all the letters. And then an investigation was initiated shortly after he was sent home. Why was he placed on non-duty status? Because they wanted him away from the institution when the CPME gave its on-site visit. That is a non-government professional organization that accredits podiatric residency programs, of which he was director. And he thought he ought to be able to be there and be interviewed like every other person affiliated with the institution, from chief of staff on down. Including residents were interviewed by this institution. Is it your allegation that he had said something to the non-governmental accreditation entity that it would have constituted whistleblowing? Definitely. He was prohibited from being in a position to give them information that they were entitled to and should have had. And then, too... We've exhausted your time. We've got one last sentence. My last sentence is this. There was investigation by the CPME later of the program the following year, and it was determined that he'd be put on probation. And there was no action taken against any of the officials of the VA, including the director at that time. And that is in effect. They responded and admitted that there was no reprimand, any kind of lower efficiency report, anything. Okay. Thank you. Thank you, Mr. Bates, and thank you, Mr. Horowitz.